1998 OK 23

Robert M. HOOVER, Jr., Appellee,

v.

The KIOWA TRIBE of OKLAHOMA,
Appellant.

No. 87139.

Supreme Court of Oklahoma.

March 17, 1998.

As Corrected March 24, 1998
and April 13, 1998.

R. Brown Wallace, Oklahoma City, for appellant.

William J. Robinson, Oklahoma City, for appellee.

ALMA WILSON, Justice:

¶1 In *Hoover v. Kiowa Tribe of Oklahoma*, 909 P.2d 59 (Okla.1995), cert. denied 517 U.S. 1188, 116 S.Ct. 1675, 134 L.Ed.2d 779 (1996) (*Hoover I* ), we rejected the argument of appellant, Kiowa Tribe of Oklahoma (the Tribe), that the common law doctrine of tribal sovereign immunity bars the exercise of jurisdiction by the state courts of Oklahoma over an action against the Tribe for damages arising out of an alleged breach of contract. *Hoover I* followed *Lewis v. The*

Sac and Fox Tribe of Oklahoma Housing Authority,[1] 896 P.2d 503 (Okla.1994), cert. denied 516 U.S. 975, 116 S.Ct. 476, 133 L.Ed.2d 405 (1995), and held that a contract executed outside of Indian country between an Indian tribe and a non-Indian is enforceable in state court.[2]

¶2 In this appeal we again consider the jurisdictional challenge. We conclude that economic activity within the state of Oklahoma by a federally recognized Indian tribe residing within the state is subject to the laws of Oklahoma and the Tribe is subject to suit in state court on the same terms as any other person. We find that the appellant/Tribe has admitted the material facts essential to appellee/Hoover's state-law contract claim for recovery of damages and hold that appellee is entitled to summary judgment as a matter as of law.

## I. The proceedings.

¶3 *Hoover I* held that the Tribe could be sued in state court and reversed the district court's dismissal. On remand, Robert M. Hoover, Jr. (Hoover), moved for summary judgment, asserting that all material facts are undisputed and that he is entitled to judgment on the promissory note in the amount of $142,499.00 as a matter of law.[3] In opposition to summary judgment, the Tribe admitted that the promissory note was executed by the chairman of its business committee[4] as consideration for the purchase

1. *Lewis v. The Sac and Fox Tribe of Oklahoma Housing Authority*, 896 P.2d at 505, concluded that Oklahoma courts have constitutionally-vested concurrent jurisdiction with the federal courts to entertain any federal-law claim which has not been explicitly withdrawn by Congress and held the Oklahoma courts have jurisdiction over a contract dispute between an Indian home buyer and an Indian housing authority.

2. Accord, *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–149, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973), wherein the Court said absent express federal law to the contrary, Indians going beyond reservation boundaries generally have been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State.

3. The undisputed facts in *Hoover I* and on summary judgment below are that on April 3, 1990,

the Tribe executed a note wherein the Tribe promised to pay Hoover $142,500.00 as consideration for the purchase of 5,000 shares of common stock in Clinton–Sherman Aviation, Inc., an Oklahoma corporation. The Tribe also executed a security agreement, pledging the stock as collateral for the note, and delivered the promissory note and security agreement to Hoover's office in Oklahoma City. The Tribe defaulted on the note and Hoover sold the collateral at a public sale, conducted on November 30, 1990. Being the highest and best bidder, Hoover purchased the stock for One Dollar and sued the Tribe for the deficiency of $142,499.00.

4. Apparently, neither the decision to buy the Clinton–Sherman Aviation, Inc. nor the contracts to accomplish the purchase were subject to approval by the Bureau of Indian Affairs or the Secretary of the Interior of the United States. Hence, we view the Tribe's economic activity to

of shares in the Oklahoma corporation and that the note is in default as a result of payments not being made, and again pressed its tribal sovereign immunity defense. The Tribe contended that: 1) as a federally recognized Indian tribe, it is immune from suit for damages; 2) its sovereign immunity was expressly reserved in the promissory note and security agreement; and, 3) Hoover failed to present any evidence that the Tribe waived its sovereign immunity or consented to be sued.

■ ¶ 4 The district court sustained Hoover's summary judgment motion, granted Hoover judgment in the amount of $142,-499.00, and awarded Hoover attorney fees. In its petition in error, the Tribe expresses its intent to preserve its jurisdictional defense pending a petition for writ of certiorari to the United States Supreme Court. It urges an exception to the "settled law of the case" doctrine [5] that a prior decision is not controlling if it is found to be erroneous and will result in manifest injustice .[6] This exception hinged on reversal of *Hoover I* by the United States Supreme Court, which denied the Tribe's petition for certiorari.[7]

## II. The Tribe's argument on summary judgment.

■ ¶ 5 The Tribe argued that a federally recognized tribe [8] may not be summoned into Oklahoma courts in a suit for damages because of inherent tribal sovereignty as recognized in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). In that case, Martinez sued the Santa Clara Pueblo Indian Tribe in federal district court seeking declaratory and injunctive relief against enforcement of a tribal ordinance which denied tribal membership to children of female members who marry outside the tribe. Recognizing that Indian tribes retain their original natural rights in matters of tribal self-government, the *Santa Clara Pueblo* Court refused to find an implicit federal district court remedy against the tribe or an officer of the tribe to redress an equal protection claim to tribal membership pursuant to the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301–1303.[9]

¶ 6 The Tribe also argued that *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), recognizes its inherent tribal sovereignty as a shield from suit

be independent of, rather than dependent upon, the protection of the federal government.

5. Questions determined in a former appeal are binding in a subsequent appeal under the "settled law of the case" doctrine. *Gay v. Hartford Underwriters Insurance Co.*, 904 P.2d 83, 88–89 (Okla.1995).

6. If an appellate court determines that its former decision in the same case is a gross or manifest injustice, it may review and reverse the erroneous decision, notwithstanding the "settled law of the case" doctrine. *Wade v. Hope & Killingsworth*, 89 Okla. 64, 213 P. 549, 550–551 (1923).

7. Ordinarily, the "settled law of the case" will not be reviewed on a subsequent appeal where the facts are the same as on the former appeal. *Smith v. Owens*, 397 P.2d 673, 675 and 678–679 (Okla.1963).

8. The Kiowa Tribe is one of 36 tribes listed by the Bureau of Indian Affairs of the U.S. Department of Interior in the Federal Register, vol. 44, p. 7235.

9. *Santa Clara Pueblo v. Martinez*, 436 U.S. at 71, 98 S.Ct. at 1684, observing that efforts of the federal judiciary to enforce the provisions of the Indian Civil Rights Act "in a civil context" might "substantially interfere" with tribal self-government, said:

Congress retains authority to authorize civil actions for injunctive or other relief to redress violations of § 1302, in the event the tribes themselves prove deficient in applying and enforcing its substantive provisions. But unless and until Congress makes clear its intention to permit the additional intrusion on tribal sovereignty that adjudication of such actions in a federal forum would represent, we are constrained to find that § 1302 does not impliedly authorize actions for declaratory or injunctive relief against either the tribe or its officers.

The Tribe urged that *Hoover I* was confused by the federal case law that permits state courts to hear suits against a federally recognized Indian tribe for equitable or declaratory relief from disputes among the triad of federal/tribal/state sovereigns so long as the state-court decree does not infringe upon tribal self-government or sovereignty, such as *Warren Trading Post Co. v. Arizona Tax Commission*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). The instant jurisdictional challenge does not arise out of the state's attempt to intrude upon federal/tribal relations, rather it arises out of a state-law contractu-

for damages in the absence of clear waiver or explicit congressional consent. In that case, the Oklahoma Tax Commission assessed the Potawatomi Tribe for delinquent taxes which the Tribe had failed to pay on cigarettes sold to tribal members and non-members at the Tribe's convenience store on Indian country land. Concluding that tribal immunity protected the tribe from direct state taxation on activities occurring within Indian country, the Court observed that the doctrine does not shield individual tribal agents and officers. In his concurring opinion in the *Citizen Band Potawatomi* case, Justice Stevens expressed doubt that tribal immunity extends to cases arising from a tribe's commercial activity outside its own territory.[10]

¶7 Neither the *Santa Clara Pueblo* case nor the *Citizen Band Potawatomi* case holds that a federally recognized Indian tribe is immune from suits for damages. This controversy arises out of the Tribe's economic activity rather than tribal relations activity that affects the integrity of the Tribe as a distinct cultural entity, and hence it is not analogous to the controversy in *Santa Clara Pueblo v. Martinez*. This controversy arises out of the Tribe's activity outside of Indian country, and hence it is not analogous to the balancing of state/tribal powers within Indian country in *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe*.

■ ¶8 The Tribe also contended that summary judgment is erroneous because the material fact of the Tribe's consent to suit was not proven. According to the Tribe, Hoover agreed that the Tribe was not relinquishing its sovereign right to be immune from suit for damages[11] and Hoover failed to prove the fact of the Tribe's consent to be sued.[12] The essence of this argument is that the Tribe has an original natural right[13] not to be summoned into state court to answer for any wrong it may have allegedly caused to another when it engages in economic activity in this state. The effect of this argument would be that the Tribe can cause no legally cognizable damages in its activity for economic gain conducted outside of Indian country. This would be so if the Tribe may not be summoned into state court for damages arising out of a state-law contract action because of tribal immunity, nor into federal court in the absence of diversity of citizenship[14] or a federal question.[15]

al relationship outside the federal government's superintendence.

10. Justice Stevens relied on *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940) for the proposition that an Indian tribe is immune from suit for damages absent congressional consent. *United States v. United States Fidelity & Guaranty Co.* held that 34 Stat. 137 authorized suit against the United States, on behalf of the dependent Choctaw and Chickasaw tribes, only in the federal court in Indian Territory. It deferred to Congress' authority to specify the federal court where a damage suit against the tribes might be brought and refused to enforce a Missouri money judgment against the tribes, but it did not hold that a federally recognized Indian tribe is absolutely immune from suit for money judgment.

11. The promissory note and security agreement provide that nothing "subjects or limits the sovereign rights of the Kiowa Tribe of Oklahoma." Neither the note nor security agreement, however, unequivocally declare that the Tribe is immune from damages suit in state court. Rather, the security agreement expressly provides, in part VII. Remedies, that the "Lender may ... exercise any and all rights and remedies provided in the Uniform Commercial Code of the state in which the Lender is located...."

12. In *Hoover I*, we considered the Tribe's legal argument in support of dismissal—that it is not subject to the jurisdiction of the Oklahoma courts without its consent because Congress has not vested the Oklahoma courts with jurisdiction over a federally recognized Indian tribe. *Hoover I* decided that Oklahoma courts have jurisdiction over the subject contract, even though the Tribe argued it did not consent to suit. On summary judgment, the district court was bound by *Hoover I*. *Grand River Dam Authority v. Grand–Hydro*, 200 Okla. 157, 201 P.2d 225, 227 (1947).

13. The concept of tribal sovereignty is not derived from our federal constitution. *Santa Clara Pueblo v. Martinez*, 436 U.S. at 56, 98 S.Ct. at 1675–76.

14. A federally recognized Indian tribe is a resident of the state where the tribe is located, for purposes of the Eleventh Amendment, and may not sue the state in federal court without the state's express consent. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

15. We recognize the Tribe's immunity defense arises under federal law, *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), but Hoover has no federal claim.

■ ¶ 9 The breadth of the inherent tribal rights urged by the Tribe—tribal immunity greater than the sovereign immunity of this State or our federal Union—presents a significant challenge to our state/federal relationship as well as our state/tribal relationships. We are behooved to further examine the Tribe's claim of inherent tribal sovereignty at any stage of the proceedings.[16] Deciding that tribal sovereignty was not a bar to state-court jurisdiction over this cause, *Hoover I*[17] said:

> As we explained in *Lewis* and we reiterate, "[W]henever Indian interests are tendered in a controversy, a state court must make a preliminary inquiry into the nature of the rights sought to be settled. Only that litigation which is explicitly withdrawn by Congress or that which infringes upon tribal self-government stands outside the boundaries of permissible state-court cognizance." *Lewis*, 896 P.2d at 508, footnote omitted. Accordingly, we hold that a contract between an Indian tribe and a non-Indian is enforceable in state court when the contract is executed outside of Indian Country.

¶ 10 Further study convinces us that no injustice has been done by our former decision[18] and today's opinion is a clarification of our decision in *Hoover I*. We begin with *Worcester v. The State of Georgia*,[19] 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 405 (1832), and the early acts of Congress which set Oklahoma apart, in many aspects, from the body of general principles of Indian common law developed in the *Worcester* progeny.[20]

### III. *Worcester v. The State of Georgia.*

¶ 11 The seminal case of *Worcester v. The State of Georgia* pronounced the common law notion of the Indian tribes' retained original natural right of self-government within Indian country as respected Indians. The notion is based on the European principles of discovery which underlie our constitutional provision that all intercourse with the Indians shall be carried on exclusively by Congress.[21] It is that when our nation was formed the government of the United States assumed a protectorate relationship with the Indian tribes or nations and the dependent Indian tribes or nations retained their original natural right of self-government over Indians within Indian country by consent of the dominant sovereign nation of the United States.

¶ 12*Worcester* settled a dispute concerning state/tribal powers within Indian country in favor of the dominant federal government. On appeal from criminal convictions and sentences in Georgia courts, *Worcester* concluded it had jurisdiction to determine whether the acts of Georgia, which abolished Cherokee law and parceled out the Cherokee country among neighboring counties in the state and subjected the inhabitants to Georgia law, were repugnant to the Constitution, laws and

---

**16.** Fundamental jurisdictional issues will be considered at any time. *Wilson v. Harlow*, 860 P.2d 793, 797 (Okla.1993).

**17.** *Hoover I*, 909 P.2d at 62.

**18.** Because we are not satisfied that our former decision constitutes gross or manifest injustice, the exception to the "settled law of the case" doctrine is not operative. This Court and the court below are bound by *Hoover I*. See, footnotes 5–7 *supra*.

**19.** In the early case of *The Cherokee Nation v. The State of Georgia*, 30 U.S. 1, 5 Pet. 1, 8 L.Ed. 25 (1831), the Court concluded that an Indian tribe was not a foreign state and could not maintain an action against the State of Georgia, and hence the Supreme Court had no jurisdiction. A year later the same Georgia law was challenged in *Worcester v. The State of Georgia*. The *Worcester* Court exercised jurisdiction, rejecting the argument that neither the courts of Georgia nor the

United States Supreme Court had jurisdiction over activity that occurred within the territory of the Cherokee nation.

**20.** R. Strickland, *Felix S. Cohen's Handbook of Federal Indian Law* (1982 Edition), p. 2, explains:

> "It is ... a mistake to view Indian law without reference to the varying times in which particular doctrines or statutory provisions were developed. Without an historical perspective, Indian law can be a mystifying collection of inconsistencies and anachronisms. The first step toward order and understanding in this field is to recognize the historical context of the different statutes and cases."

> As will be discussed, the State of Oklahoma has a unique history compared to her sister states in regard to relations with Indian tribes residing within the boundaries of Oklahoma.

**21.** *Worcester v. The State of Georgia*, 31 U.S. at 542; and U.S. Const., art. 1, § 8.

treaties of the United States. *Worcester* held that Georgia's legislation extending its jurisdiction over the Cherokee nation and Cherokee country interfered with the relations established between the United States and the Cherokee nation, the regulation of which is committed exclusively to the federal government under settled principles of constitutional law.

¶ 13 *Worcester* observed that from time immemorial the Indian nations were considered as "distinct, independent political communities, retaining their original natural rights as the undisputed possessors of the soil, with the single exception of that imposed by the irresistible power which excluded them from intercourse with any other European potentate than the first discoverer of the coast of the particular region claimed."[22] Pursuant to the principles of discovery, Great Britain purchased the soil and the alliance of the Indians, but did not interfere with their self-government as respected Indians only; the Indian nations were bound to the British crown as dependent allies, receiving their supplies and protection from, and confining their trade to, Great Britain, without surrendering the right of self-government on subjects not connected with trade; and, the Indian nations or tribes assumed the relationship with the United States that they had with Great Britain.

¶ 14 In his concurring opinion in *Worcester*, Justice McLean further explained that, as to Indian sovereignty, the Indians had the right of occupancy but the fee to the land was considered to be in the government and the Indians had the right of self-government with attributes of sovereignty, but the sovereignty of the country existed only in the government.[23] Justice McLean observed that Indian country was separated from the states by the consent of the states in adopting the constitution and that the United States Congress has always had the exclusive power to confine or even abrogate the Indian nations' right of self-governance.[24]

## IV. The Organic Act of 1890.

¶ 15 Exercising its exclusive power, Congress set aside Indian Territory for the use of various Indian tribes or nations, specifying the area within Indian Territory to be occupied by each tribe or nation.[25] Each tribe possessed the assigned land in common for all its members and had exclusive control over the Indians within the tribal boundaries.[26] Subsequently, Congress abrogated the tribes' exclusive control over Indians and Indian country when it established Oklahoma Territory and subjected the individual Indi-

**22.** *Worcester v. The State of Georgia*, 31 U.S. at 558–559. *Worcester* explained that the notion of the dependent Indian nations with retained original natural right of self-government within Indian country subject to the dominant power of the United States Congress, rested upon the European principles of discovery—1) that discovery gave title to the government by whose subjects or by whose authority it was made against all other European governments; 2) that title consummated by possession gave the exclusive right to purchase the soil from the aboriginal occupants or the occupants by virtue of a discovery made before the memory of man; and 3) that the independence of the original occupants was not surrendered by selling the soil to the European discoverer and seeking its protection.

**23.** *Worcester v. The State of Georgia*, 31 U.S. at 562.

**24.** Accord, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), wherein the Court observed Congress' power to abrogate Indian treaties.

**25.** The European discovery principles of retained original natural right of self-government were embodied in the 1802 act to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontiers as discussed in *Worcester* and in the Indian Removal Act of 1830, whereby Indian tribes east of the Mississippi River were to be relocated to lands in Indian country. The boundaries of Indian country were fixed west of the Mississippi river, not within the states of Missouri and Louisiana or Arkansas Territory and not within any state to which Indian title has not been extinguished, 4 Stat. 729. The Stokes Commission mapped Indian Territory, most of what would become the state of Oklahoma, divided the mapped-out land, and assigned the divided Indian Territory for the use of various Indian tribes or nations.

**26.** On October 21, 1867, a treaty of peace was made between the United States and the Kiowa, Comanche, and Apache tribes at Medicine Lodge Creek in Kansas. The tribes agreed to a confederation and were given a reservation in what later became the State of Oklahoma. 15 Stat. 581, 589.

ans to the governments of the United States, even though the tribes retained the right of tribal self-governance.

¶ 16 The Oklahoma Organic Act of May 2, 1890 [27] permitted all Indians inhabiting Indian Territory to participate in the governments of the Union, as citizens of the United States, without forfeiting their natural right of tribal self-governance. The Organic Act divided Indian Territory into Oklahoma Territory and Indian Territory. It established a territorial government for Oklahoma Territory.[28] In Oklahoma Territory, voting and office-holding were available to all adult male residents who were citizens of the United States or who had declared their intention to become citizens, and these rights could not be denied on the basis of race or color.[29] The jurisdiction of the courts in Oklahoma Territory was extended over all Indians inhabiting the territories.[30] In Indian Territory, United States citizenship was available to any member of Indian tribes [31] and the jurisdiction of the United States court was expanded to all civil cases, except cases over which the tribal courts had exclusive jurisdiction.[32]

¶ 17 As anticipated by Justice McLean in *Worcester*, Congress had moved toward amalgamation of the native American Indians into the governments of the Union in Oklahoma Territory and Indian Territory.[33] In

27. 26 Stat. 81.

28. Indian country was not excluded from the territorial limits nor jurisdiction of Oklahoma Territory as it was from the boundaries of Montana Territory, 13 Stat. 85, 86, and Idaho Territory, 12 Stat. 808, 809., until the tribe(s) agreed to be included, and the territories of Montana, 13 Stat. at 91, and Idaho, 12 Stat. at 814, were required to "faithfully and rigidly observe" the treaties, laws, and other engagements between the United States and the Indian tribes.

29. 26 Stat. at 84, § 5. In contrast, Congress did not provide for the Indian inhabitants to participate in the government for the Territory of New Mexico, 9 Stat. 446, 449, nor the Territory of Idaho, 12 Stat. 808, 810, where the franchise was extended only to free white male inhabitants.

30. The Oklahoma territorial district courts were vested with exclusive jurisdiction over all offenses committed within the territorial boundaries and all civil cases between citizens of the United States and citizens or persons residing or found in the territory, 26 Stat. at 86, § 9, and criminal offenses and civil controversies between members or citizens of one tribe against members or citizens of other tribes, as if they were citizens of the United States. Id. at 88, § 12. Controversies between Indians of the same tribe while sustaining their tribal relations were excepted from the court's jurisdiction, but persons of Indian blood had the right to invoke the aid of the courts for protection of person or property. Id.

31. 26 Stat. at 99–100, § 43.

32. Congress originally established the United States court in Indian Territory on March 1, 1889. 25 Stat. 783. The court had no jurisdiction over controversies between persons of Indian blood only, *Id.*, at 784, and Indians, not citizens of the United States, were excluded as competent jurors in cases involving citizens of the United States, *Id.*, at 786. The Organic Act extended the jurisdiction of the United States court in Indian Territory specifically over all cases on contracts entered into by citizens of any tribe or nation with citizens of the United States in good faith, for valuable consideration and in accordance with tribal law, and such contracts were deemed to be valid and enforceable by the courts. 26 Stat. at 93–94, § 29. The court had the power of attachment of improvements on tribal owned property made by mining persons or entities, railroads, or industries under lease or permission of Indian law or federal law, but all other improvements on tribal property was excepted from attachment. Id. at 95, § 31. Execution was withheld for sale of improvements on tribal owned property except where attachment was allowed. Id. at 96, § 31. Judicial tribunals of the Indian nations retained exclusive jurisdiction in all civil and criminal cases arising in the country "in which members of the nation by nativity or adoption shall be the only parties," Id. at 94, § 30, as nothing in the act was to interfere with the power of tribes or nations to punish their own members. Id. at 96, § 31.

33. Concurring in *Worcester*, Justice McLean observed that the occupancy of Indian soil was never assumed, except upon a basis of contract and payment of valuable consideration; that the Indians' right of occupancy has never been questioned, even though the fee in the soil has been considered in the government; and, that all the rights which belong to self-government, attributes of sovereignty, have been recognized as vested in the Indians, but at no time has the sovereignty of the country been recognized as existing in the Indians. Further, Justice McLean viewed the exercise of the power of self-government by the Indians, within a state, as undoubtedly temporary, in light of the settled policy of the government in the extinguishment of their title and emphasized that the act of 1802, to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontiers, by its own

Oklahoma Territory and Indian Territory, Congress abandoned the system of tribal possession and control of Indian country when it imposed its territorial governments over Indians, but it continued the tribes' control over intra-tribal relations and controversies arising between Indians of the same tribe. That is, Congress did not interfere with the tribes' original natural right of self-government as respected Indians only.

## V. Allotment of tribal lands, final disposition of the Five Civilized Tribes, and the proposed state of Sequoyah.

¶ 18   To carry out the policy of assimilation, Congress moved to convey ownership of Indian country to the individual Indians. During the 1890's, individual Indians selected their allotments out of tribal lands and became citizens of the United States.[34]   On October 6, 1892, the confederated Kiowa, Comanche, and Apache tribes surrendered their rights in the assigned tribal lands to the United States so that the lands could be

allotted to the members of the confederated tribes in severalty, with fee simple title to be conveyed 25 years thereafter.[35]   On June 6, 1900, Congress provided for the allotment of the Comanche, Kiowa and Apache tribes' land in severalty to the members.[36]

¶ 19   The Five Civilized Tribes in Indian Territory agreed to the allotment of their tribal lands in preparation for statehood, and in 1893, the Dawes Commission was established to facilitate the allotment of the lands of the Five Civilized Tribes.[37]   The Curtis Act of June 28, 1898,[38] ratified the Atoka Agreements made between the Commission for the Five Civilized Tribes (the Dawes Commission) and the Choctaw and Chickasaw Tribes on April 23, 1897, and the Creek Nation on September 27, 1897.[39]   Eight years after the Atoka Agreements and the Curtis Act, in March, 1906, the Five Civilized Tribes submitted a proposed Constitution for the State of Sequoyah in Indian Territory,[40] in accordance with the intent expressed in the Atoka Agreements.[41]   On April 26, 1906,

terms was not to be construed to prevent trade and intercourse with Indians living on lands surrounded by settlements of citizens of the United States and being within the ordinary jurisdiction of any of the individual states.   31 U.S. at 579, 592–593.

34.   24 Stat. 388 and 26 Stat. 794, acts to allot land in severalty to Indians on the various Indian reservations and to extend the protection of the laws of the United States over the Indians.

35.   *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903).

36.   31 Stat. 677.

37.   R. Strickland, *Felix S. Cohen's Handbook of Federal Indian Law* (1982 Ed.) p. 774.

38.   30 Stat. 495.   The Curtis Act, intended to expedite the allotment process, *Id.* at 497, provided for the making of the rolls of citizenship of the Five Civilized Tribes, *Id.* at 502–504, and settlement of tribal membership claims, *Id.* at 496; abolished all tribal courts in Indian Territory, transferred all civil and criminal cases to the United States court in Indian Territory, *Id.* at 504–505, vested that court with exclusive jurisdiction to determine title and ownership of Indian land, *Id.* at 496, and required that the tribe be made a party if property of the tribe might be affected, *Id.* at 495–496; defined "officer" to include officers of tribes for certain criminal prosecution purposes, *Id.* at 495; and declared that tribal laws shall not be enforced at law or in

equity by the United States court in Indian territory, *Id.* at 504.

39.   Congress did not ratify the agreement with the Cherokee Tribe which provided that the Cherokees would never be a part of any state without their consent.   A. Maxwell, *The Sequoyah Constitutional Convention* (1953) p. 27.

40.   C. Allen, *The Sequoyah Movement* (1925) p. 44.

41.   The Atoka Agreement with the Choctaw and Chickasaw Tribes provided:

It is further agreed, in view of the modification of legislative authority and judicial jurisdiction herein provided, and the necessity of continuance of the tribal governments so modified, in order to carry out the requirements of this agreement, that the same shall continue for the period of eight years from the fourth day of March, eighteen hundred and ninety-eight.   This stipulation is made in the belief that the tribal governments so modified will prove so satisfactory that there will be no need or desire for further change till the lands now occupied by the Five Civilized Tribes shall, in the opinion of Congress, be prepared for admission as a State to the Union.   But this provision shall not be construed to be in any respect an abdication by Congress of power at any time to make needful rules and regulations respecting said tribes.
30 Stat. at 512.

Congress provided for the final disposition of the affairs of the Five Civilized Tribes.[42] In June, two months after dissolving the tribes as nations outside the governments of the federal Union, Congress rejected the proposed state of Sequoyah for the Indian Territory.[43] On June 12, 1906, Congress enabled the admission of Oklahoma Territory and Indian Territory as a single state of the United States.[44]

¶ 20 Congressional policy of assimilation set Oklahoma apart from other states where Congress preserved designated Indian country within the boundaries of the pre-statehood territories. The differences are obvious from a comparison of the enabling legislation and state constitutions.

## VI. The Enabling Act and Oklahoma Constitution.

¶ 21 The first section of the Oklahoma's Enabling Act recognized the superior, plenary power of the federal government over the rights and property of Indians.[45] In contrast, the same congressional enactment provided that Indian lands in Arizona Territory and New Mexico Territory "shall remain subject to disposition and under the absolute jurisdiction and control of the Congress of the United States." [46] And identical provisions preserving to the United States "absolute jurisdiction and control over Indian lands" are in the enabling legislation for the states of North Dakota, South Dakota, Montana, and Washington,[47] and Utah.[48]

¶ 22 The second section of Oklahoma's Enabling Act provided that all male persons over the age of 21–years, who are citizens of the United States or who are members of any Indian nation or tribe in said Indian Territory and Oklahoma and resided therein for at least six months preceding are qualified to vote and eligible to serve as delegates to the constitutional convention and specified the number of delegates to be elected by vote or party convention in each of the former tribal territories [49] and the third section pre-

---

42. 34 Stat. 137, considered in *United States v. United States Fidelity & Guaranty Co.*, footnote 10, *supra*. The legislation provided that upon dissolution of the tribes, tribal lands were not to become public lands nor property of the United States, but were to be held in trust by the United States for the use and benefit of the "Indians respectively comprising each of the tribes", *Id.* at 148; and, "tribal existence" and "tribal governments" were to continue for all purposes authorized by law, but tribal legislatures could meet no more than 30 days in any one year and tribal laws were invalid unless approved by the President of the United States and contracts involving tribal funds or any other tribal property were invalid without presidential approval. It closed the rolls of the tribes as of December 1, 1905, *Id.* at 137, to be completed as of March 4, 1907, at *Id.* at 138; abolished tribal taxes as of December 31, 1905, *Id.* at 141; subjected tribal officers to prosecution for the value of tribal property not reported to the Secretary of the Interior upon dissolution of the tribes, *Id.* at 141; directed the Secretary of the Interior to assume control of the Indian schools, *Id.* at 140, to take possession of all buildings used for tribal government or other tribal purposes, *Id.* at 143, and to bring suit in the United States courts in Indian Territory on behalf of the tribes for the collection of moneys or recovery of land claimed by any of the tribes, *Id.* at 144; restricted allotted lands for a period of 25 years and upon removal of the restricted subjected the allotted lands to taxation, *Id.* at 144; authorized construction of public highways on every section line, to be paid for by tribal funds under the supervision of the Secretary of the Interior until inauguration of a state govern-

ment, *Id.* at 145; and, provided that complaints against transmission companies and railroads were to be governed by 32 Stat. 44, 45, subject to "control by the future Territory or State within which the Indian Territory may be situated," *Id.* at 146.

43. Casey, O., *And Justice for All* (1989).

44. 34 Stat. 267. Oklahoma's Enabling Act also enabled the admission of Arizona Territory and New Mexico Territory as a single state of the United States.

45. 34 Stat. at 267–268, provided that nothing contained in the constitution for the State of Oklahoma would "be construed to limit or impair the rights of person or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this Act had never been passed."

46. Id. at 279.

47. 25 Stat. 676, 677.

48. 28 Stat. 107.

49. 34 Stat. at 268.

served to the Indians civil and political rights in the state government.[50] In contrast, the provisions relating to the territories of Arizona and New Mexico[51] provided that the constitution shall make no distinction in civil or political rights on account of race or color, except as to Indians not taxed, as did the enabling legislation for North Dakota, South Dakota, Montana, and Washington.[52]

¶ 23 The third section of Oklahoma's Enabling Act also required that the people inhabiting Oklahoma must "forever disclaim all right and title in and to ... lands lying within the said limits owned or held by any Indian, tribe, or nation."[53] In contrast, the enabling legislation for North Dakota, South Dakota, Montana, and Washington,[54] and Utah[55] required the constitutional convention to provide by ordinance, irrevocable without the consent of the United States and the people of said State, that the people inhabiting said proposed State forever disclaim all right and title to all lands lying within said limits owned or held by any Indian or Indian tribes; that such Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; but that the state is not precluded from taxing, as other lands and other property are taxed, any lands or other property owned or held by any Indian who has severed his tribal relations and has obtained from the United States or from any person a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any Act of Congress exempting the lands thus granted from taxation. Enabling legislation for New Mexico and Arizona[56] provid-

ed similarly but with a proviso that the state was not precluded from taxing lands or property of Indians outside of an Indian reservation, save and except such lands that have been granted or acquired under an Act of Congress exempting the lands thus granted from taxation.

¶ 24 As required by the Enabling Act, the Constitution of Oklahoma, Art. I, § 3 disclaims forever all right and title to all lands lying within the limits of Oklahoma and owned or held by any Indian, tribe, or nation. It also disclaims all right and title to and jurisdiction over any unappropriated public lands[57] lying within the boundaries of Oklahoma and prohibits state taxation of lands belonging to or purchased by the United States or reserved for its use. In contrast, the constitutions of Arizona, Art. XX, Par. 4 and 5, and New Mexico, Art. XXI, § 2 disclaim all right and title to all lands lying within said boundaries owned or held by any Indian or Indian tribes which were acquired through or from the United States or any prior sovereignty and declare that the Indian or tribal lands are subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States. Those constitutions also provide that no taxes will be imposed on any lands or other property within an Indian Reservation owned and held by any Indian, but that taxes may be imposed on any lands or other property outside of an Indian Reservation owned or held by any Indian, unless exempted therefrom by Congress. The constitutions of Montana, Art. I, North Dakota, Art. XIII, § 1, South Dakota, Art. XXII, Second par.,

---

50. *Id.*, at 270, provided that the state constitution must be republican in form and make no distinction in civil or political rights on account of race or color.

51. The exception was eliminated in subsequent enabling legislation for the proposed states of New Mexico and Arizona, 36 Stat. 557.

52. 25 Stat. at 677.

53. *Id.*, at 270.

54. 25 Stat. at 677.

55. 28 Stat. 107.

56. 36 Stat. at 559.

57. See, footnote 42, *supra*. In providing for the final disposition of the affairs of the Five Civilized Tribes, Congress provided that tribal lands would not become public lands nor property of the United States, 34 Stat. at 148. That is, the government would have to purchase Indian or tribal land. The Enabling Act does not provide that Indian nor tribal lands would become public lands. The disclaimer of jurisdiction in Art. 1, § 3, Okla. Const.—that until title to such public lands shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States—simply does not reach Indian country.

Utah, Art. III, Par. 2, and Washington, Art. XXVI, Second par., also disclaim all right and title to all lands lying within said limits owned or held by any Indian or Indian tribes and declare that Indian or tribal lands are subject to disposition and under the absolute jurisdiction and control of the Congress of the United States. Those constitutions also provide that taxes may be imposed on any lands owned or held by any Indian who has severed his tribal relations, unless exempted therefrom by Congress.[58]

¶ 25   Having provided for the assimilation of the Indians in Oklahoma Territory and Indian Territory into the governments of the federal union, Congress amended the Enabling Act to transfer causes, proceedings, and matters, civil or criminal, pending in the federal courts to the courts of the State of Oklahoma without regard to whether the controversy arose in Indian country.[59]   Congress established two judicial districts for the federal district courts attached to the eighth circuit court of appeals.   All civil causes, proceedings, and matters pending in the supreme or district courts of Oklahoma Territory or in the United States courts in the Indian Territory wherein a federal question was presented or there was diversity of citizenship between or among the parties or citizens of same state claimed grant of land from different states were to be transferred to the federal district courts or the circuit court upon timely application, except causes wherein the United States was a party were to be transferred without application;[60]  and pending prosecutions of federal crimes were to be transferred to the federal district courts or the circuit court.[61]   All causes, proceedings, and matters, civil or criminal, pending in the district courts or the supreme court of the Territory of Oklahoma or in the United States courts of the Indian Territory, not transferred to the federal district courts or the circuit court, were to proceed in the supreme court or other final appellate court or the district courts of the State of Oklahoma as the successor courts, with instruction that all criminal cases pending in the United States courts in the Indian Territory were to be finally determined under the law in force in the territory.[62]   In the Schedule attached to the Oklahoma Constitution, cases, proceedings, and matters pending in the courts in Oklahoma Territory and Indian Territory, not transferred to the United States district courts or circuit court, were transferred to the courts of the State of Oklahoma, without regard to whether the controversy arose in Indian country or whether an Indian or an Indian tribe or nation was a party litigant, except cases where the only parties were members of the same tribe and controversies that arose between members of the same tribe while sustaining their tribal relations.[63]

## VII.   Oklahoma statehood.

¶ 26   In organizing Oklahoma Territory, the European discovery principles of separa-

---

**58.**   The extent to which a state constitution provides a barrier to the assumption of jurisdiction is a question for the particular state. *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 493, 99 S.Ct. 740, 757, 58 L.Ed.2d 740 (1979).   Montana's Enabling Act and Constitution reserved exclusive jurisdiction over the Indians within Indian lands to the United States. *Draper v. United States*, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 (1896).   The Supreme Court of Oklahoma, in *Higgins v. Brown*, 1 Okla.Crim. 33, 20 Okla. 355, 94 P. 703 (1908), discussed in great detail the implications of the *Draper* opinion.   *Higgins* held that Congress, in § 7 of the Enabling Act, specifically and expressly excepted the lands referred to as exclusively under the jurisdiction of the United States. The lands allotted to the Indians were not among those mentioned.   Accordingly, neither this state's Enabling Act nor its Constitution deprived the state of the jurisdiction it had been given over the Indian.   More recently, this Court has determined that the disclaimer of right and title to land in the Okla. Const., art. 1, § 3, is proprietary in nature and the governmental interests and jurisdiction of the state is not disclaimed unless title to the land is affected.   *Currey v. Corporation Commission of Oklahoma*, 617 P.2d 177, 180 (Okla.1980).

**59.**   36 Stat. 1286.

**60.**   *Id.*

**61.**   *Id.*, at 1287.

**62.**   *Id.*

**63.**   Disputes between members of the same tribe were excluded from the jurisdiction of the territorial courts by §§ 12 and 30 of the Organic Act, 26 Stat. 81.

tion and protection gave way to this nation's policy of assimilation. From the formation of Oklahoma Territory until Oklahoma statehood, Congress moved to assimilate the individual tribal members into the governments of the federal Union. Indian country was allotted and Indians were granted citizenship. Congress enabled the inhabitants of Oklahoma and Indian Territory, expressly including Indians, to form a constitution and state government. The state government formed in the Constitution of the State of Oklahoma, together with the Schedule attached thereto, was to function for the benefit of all Oklahoma citizens, including Indian citizens. At statehood, tribal existence continued and the tribes retained the right to settle controversies between members of the same tribe and controversies that arise between members of the same tribe while sustaining their tribal relations.

¶ 27 The citizens, Indian and non-Indian, inhabiting the State of Oklahoma were included within state government and required to forever disclaim any right or title in lands owned or held by Indians or tribes or unallotted or unappropriated tribal lands, which were to be held in trust for the benefit of members of the tribes by the United States and not as public lands and the state government in Oklahoma could not alter the Indians' proprietary right or title to such land. With the exceptions of intra-tribal affairs and proprietary right and title to lands owned or held by Indians or tribes, by Proclamation of Statehood signed by President Theodore Roosevelt on November 16, 1907, the State of Oklahoma was admitted into the Union on an equal footing with the original states.

## VIII. Other Congressional Acts.

¶ 28 Through the process of assimilation, Oklahoma Indian tribes continued as distinct cultural entities, but not as separate political entities.[64] In 1936, Congress provided that Indian tribes in Oklahoma could organize by adopting constitutions and by-laws and that the tribal organization could have all the powers of a body corporate under the laws of the state of Oklahoma.[65] The Oklahoma Indian Welfare Act allowed any tribe in Oklahoma to establish a mechanism for tribal autonomy, with powers cognizable under Oklahoma law.

¶ 29 In *Oklahoma Tax Commission v. United States*, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943), the Supreme Court discussed the status of the tribes in Oklahoma after the Oklahoma Indian Welfare Act. The Court noted that although *Worcester v. The State of Georgia* had held that a state might not regulate the conduct of persons in Indian territory on the theory that Indian tribes were separate political entities with all the rights of independent status, that condition had not existed in Oklahoma for a number of years. The Court observed that "there are

64. Congress halted its assimilation efforts in other states in 1934 with the enactment of the Indian Reorganization Act. 48 Stat. 984, codified at 25 U.S.C. §§ 461, et seq. The Indian Reorganization Act specifically excluded tribes in Oklahoma from the provisions relating to self-government and tribal organization. Congressman William W. Hastings, a Cherokee from Tahlequah, Oklahoma, in opposition to the original bill, told the House that the Indians of Oklahoma were now governed by state and federal law, and subject to state and federal courts. 78 Cong. Rec. 9269–9270 and 11738–11739. Legislative history indicates that Oklahoma Indians were excluded because of the assimilation progress and to avoid any potential encouragement of returning to reservations. *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439 (D.C.Cir.1988).

65. The Oklahoma Indian Welfare Act, 49 Stat. 1967, codified at 25 U.S.C. §§ 501, et seq., provided that any federally recognized Indian tribe residing in Oklahoma could organize for its common welfare and adopt a constitution and by-

laws. It authorized the Secretary of the Interior to issue a charter of incorporation to any such organized group, when ratified by a vote of the majority, which "may convey to the incorporated group, in addition to any powers which may properly be vested in a body corporate under the laws of the State of Oklahoma, the right to participate in the revolving credit fund and to enjoy any other right or privilege secured to an organized Indian tribe." 25 U.S.C. § 503. It authorized ten or more Indians residing in close proximity to form an association for the purpose of credit administration, production, marketing, consumers' protection or land management, and "those matters not covered by the federal act, regulations or charters, would be governed by the laws of Oklahoma." 25 U.S.C. § 504. And, it provided that the association could sue or be sued in any court, state or federal, in Oklahoma, having jurisdiction of the cause of action. 25 U.S.C. § 505.

remnants of the form of tribal sovereignty, [but the Oklahoma Indians] have no effective tribal autonomy" and "they are actually citizens of the State with little to distinguish them from all other citizens except for their limited property restrictions and their tax exemptions." [66] Recognition that former Indian country was included within the boundaries of the State of Oklahoma and that state laws of general application to private persons had the same force and effect over the Indian citizens, with the exception of the property restrictions and tax exemptions on Indian property, is implicit in *Oklahoma Tax Commission v. United States.*

¶ 30 Ten years later in Public Law 83–280 (P.L. 280),[67] Congress extended state jurisdiction over Indians and Indian country in six states [68] and consented to the assumption of jurisdiction over Indians and Indian country in all other states.[69] Legislative history reveals that the Department of the Interior informed Congress that Oklahoma disclaimed jurisdiction over Indians within Indian country as did Arizona, Montana, New Mexico, North Dakota, South Dakota, Utah, and Washington.[70] In response to the Interior Department's inquiry of Oklahoma regarding the enactment of Public Law 83–280, Governor Johnston Murray wrote: [71]

> When Oklahoma became a state, all tribal governments within its boundaries became merged in the state and the tribal codes under which the tribes were governed prior to statehood were abandoned and all Indian tribes, with respect to criminal and civil causes, came under state jurisdiction ... Public Law No. 280 will not in any [way] affect the Indian citizens of this state.

¶ 31 The unique history of Oklahoma statehood has been obscured by application

**66.** *Oklahoma Tax Commission v. United States,* 319 U.S. at 602–603, 63 S.Ct. at 1286. In deciding that an inheritance by an Indian may be subject to Oklahoma taxation, the Court observed that for a number of years Oklahoma Indian tribes had not been recognized as separate political entities with all the rights of independent status.

**67.** 25 U.S.C. §§ 1321, et seq.

**68.** P.L. 280 extended state civil jurisdiction over Indian country in Alaska, California, Minnesota, Nebraska, Oregon, and Wisconsin, expressly providing that the state shall have jurisdiction over actions between Indians or to which Indians are parties which arise in the areas of Indian country to the same extent that such state has jurisdiction over other causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State.

**69.** As to those states where Congress withheld jurisdiction over Indians and Indian country in the enabling legislation, Congress consented to the state assumption of jurisdiction in § 6 of P.L. 280, codified at 25 U.S.C. § 1324. These were the so-called "disclaimer" states. Oklahoma was not a "disclaimer" state under § 6 of P.L. 280 as to controversies that arise in Indian country between Indians and non-Indians, pursuant to the organic and enabling legislation. Further, Oklahoma's civil jurisdiction over Indians was more extensive than the jurisdiction granted in P.L. 280, which is restricted by a proviso codified at 25 U.S.C. § 1322(b) and (c). Section 1322 withholds probate jurisdiction, which Oklahoma had since statehood. R. Strickland, *Felix S. Cohen's*

*Handbook of Federal Indian Law* (1982 Edition) p. 795.

As part of the Indian Civil Rights Act, Congress amended P.L. 280 to provide that Indians must consent to the assumption of jurisdiction by a disclaimer state. P.L. 90–284, 82 Stat. 77.

**70.** Orme Lewis, Assistant Secretary of the Interior, advised a congressional committee that Oklahoma's constitution expressly disclaims jurisdiction over Indian lands. Senate Report 699, 1953 U .S.Code Cong. & Adm.News, p. 2412. By letter, Lewis said:

> It appears there are legal impediments to the transfer of jurisdiction over Indians ... the enabling acts for the following States, and in consequence the constitutions of these States, contain express disclaimers of jurisdiction. These states are Arizona, Montana, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, and Washington. In these cases the enabling acts required the people of the proposed States expressly disclaim jurisdiction over Indian land and that, until Indian title was extinguished, the lands were to remain under the absolute jurisdiction and control of the Congress of the United States. In each instance the State constitution contains an appropriate disclaimer. It would appear in each case, therefore, that the Congress would be required to give its consent and the people of each state would be required to amend the State constitution before the State legally could assume jurisdiction.

**71.** Strickland, R., *The Indians in Oklahoma,* (University of Oklahoma Press, 1980) p. 76.

of P.L. 280 to Oklahoma as a disclaimer state [72] together with the definition of "Indian Country" in the Major Crimes Act.[73] This body of federal common law metes out state/tribal rights and powers over activities occurring in "Indian country." [74] The federal common law, however, has not established a principle that Indian tribes have an inherent right to be immune from state court jurisdiction over its activities outside of Indian country.

¶ 32   Our independent research reveals no federal legislation immunizing the Tribe's economic activity involved herein from state court jurisdiction on the same terms as any other person.   And, recent pronouncements of the United States Supreme Court support our original holding in *Hoover I.*

## IX.   Recent Supreme Court jurisprudence.

¶ 33   The recent pronouncements on inherent tribal rights and powers have been rendered in the context of tribal jurisdiction over non-Indians in Indian country.   These opinions are instructive in determining the breadth of the inherent tribal rights which the Tribe asserts as a sovereign immunity defense to this suit for breach of contract damages.

¶ 34   In *Strate v. A–1 Contractors,* —— U.S. ——, 117 S.Ct. 1404, 137 L.Ed.2d 661

(1997),[75] the unanimous Court concluded that the tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction and the tribes' civil authority does not extend to activities of nonmembers on non-Indian fee lands, unless authorized by treaties or statutes or the two exceptions in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).[76]   *Montana* enunciated two exceptions to the general principle that inherent tribal powers and rights beyond what is necessary to protect tribal self-government or control internal relations is inconsistent with the dependent status of the tribe and cannot survive without express congressional delegation.   The *Montana* exceptions are that an Indian tribe retains the inherent power to exercise civil jurisdiction over non-Indians on the reservation (in Indian country) where:  1) the non-Indian enters a consensual relationship with the tribe or tribal members through commercial dealings, contracts, leases, or other arrangements;  or 2) the non-Indian conduct threatens or has direct effect on the political integrity, economic security or health or welfare of tribe .[77]

¶ 35   *Strate* [78] rejected the argument that *National Farmers Union Insurance Cos. v. Crow Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985) and *Iowa Mutual Insurance Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct.

72.   *Ahboah v. Housing Authority of the Kiowa Tribe of Indians,* 660 P.2d 625, 630–631 (Okla. 1983) concluded that the Constitution of Oklahoma presented no barrier to the state's authority over persons and property within its territorial boundaries, but that P.L. 280 preempted Oklahoma's jurisdiction over disputes involving Indian trust property. *Lewis v. Sac and Fox Tribe,* 896 P.2d at 509, determined *Ahboah* was plainly overbroad and resulted in excessive abnegation of power.

73.   The Major Crimes Act of 1948 codified in 18 U.S.C. § 1151, defined "Indian country" and the definition has been applied to determine civil as well as criminal jurisdiction of state courts. *De-Coteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300, rehearing denied 421 U.S. 939, 95 S.Ct. 1667, 44 L.Ed.2d 95 (1975).   R. Strickland, *Felix S. Cohen's Handbook of Federal Indian Law* (1982 Ed.) p. 777.

74.   See, *Alaska v. Native Village of Venetie Tribal Government,* —— U.S. ——, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998); and, *South Dakota v. Yankton*

*Sioux Tribe,* —— U.S. ——, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998).

75.   *Strate v. A–1 Contractors* considered a question of tribal adjudicative authority over non-Indians: When an accident occurs on a portion of a public highway maintained by the State under a federally granted right-of-way over Indian reservation land, may tribal courts entertain a civil action against an allegedly negligent driver and the driver's employer, neither of whom is a member of the tribe.

76.   *Montana v. United States* considered a question of tribal legislative authority over non-Indians: Whether the Crow Tribe of Indians had the power to regulate hunting and fishing by non-Indians on lands within its reservation owned in fee simple by non-Indians.

77.   *Montana,* 450 U.S. at 565–66, 101 S.Ct. at 1258.

78.   *Strate,* —— U.S. at ——, 117 S.Ct. at 1413.

971, 94 L.Ed.2d 10 (1987), expanded *Montana's* view of inherent tribal sovereignty. Observing that *Montana* broadly addressed the concept of sovereign powers of an Indian tribe, *Strate* reiterated that *National Farmers and Iowa Mutual* enunciate only an exhaustion requirement, a prudential rule, not a jurisdictional rule and then held that: [79]

> As to nonmembers, we hold, a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction. Absent congressional direction enlarging tribal-court jurisdiction, we adhere to that understanding. Subject to controlling provisions in treaties and statutes, and the two exceptions identified in Montana, the civil authority of Indian tribes and their courts with respect to non-Indian fee lands generally "do[es] not extend to the activities of nonmembers of the tribe."

¶ 36 *Strate* explained that where tribal court jurisdiction is grounded exclusively on the concept of retained or inherent power, then: 1) the facts must bring the matter within one of the two *Montana* exceptions; 2) the element of *on-reservation or within tribal boundaries* is critical to the *Montana* exception relating to activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements on non-Indian land within reservation; and, 3) the *Montana* consensual relationship exception, includes activity such as a) on-reservation sales transactions between nonmember and member, b) tax on nonmember property *within boundaries of* reservation, c) tax on nonmember privilege of doing business within tribe's borders, and d) tax on on-reservation cigarette sales to non-members.[80] *Strate* further explained that key to the second *Montana* exception, non-Indian activity that threatens or has

some direct effect on the political integrity, the economic security, health or welfare of the tribe, is whether the activity interferes with the tribe's retained power a) to punish tribal offenders, b) to determine tribal membership, c) to regulate domestic relations among members, and d) to prescribe rules of inheritance for members.[81]

¶ 37 We find no support in *Strate* for the Tribe's contention that it retains inherent powers and rights of sovereignty, and thus sovereign immunity, when it ventures outside of Indian country and enters into a contractual relationship with a non-Indian. Following the teachings of *Strate,* the Tribe's retained inherent powers and rights dissipate when: 1) it is outside of Indian country and enters into consensual economic activity with non-tribal members; or 2) it engages in activity with non-tribal members that does not directly affect retained tribal power to punish tribal offenders, to determine tribal membership, or to regulate domestic relations among members. The fact that a money judgment might indirectly impact tribal programs does not remove the instant case from the main rule of *Montana* —that inherent tribal powers and rights beyond what is necessary to protect tribal self-government or control internal relations is inconsistent with the dependent status of the Tribe and cannot survive without express congressional delegation.[82]

## X. Conclusion.

¶ 38 The Tribe's contention that it retains *inherent powers and rights of sovereignty,* and thus sovereign immunity, when it ventures anywhere in the State of Oklahoma and enters into a contractual relationship is inconsistent with Oklahoma's historical relationship with Indian tribes located in Oklahoma. The remnants of tribal sovereignty

---

79. *Id.*

80. *Strate,* —— U.S. at ——, 117 S.Ct. at 1415.

81. *Strate,* —— U.S. at ——, 117 S.Ct. at 1416.

82. Accord, *United States v. Wheeler,* 435 U.S. 313, 326–30, 98 S.Ct. 1079, 1087–1090, 55 L.Ed.2d 303 (1978), wherein the Court said Indians implicitly lost part of their sovereignty by virtue of their dependent status; the areas in which such implicit divestiture of sovereignty has

been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe; rights of independent sovereign—rights which do not stem from the U .S. Constitution nor the federal government—are attributes of local self government when exercising their tribal functions, even though subject to the supreme legislative authority of the United States.

retained by the Oklahoma tribes at statehood did not provide a cloak of immunity from state court jurisdiction for damages caused by a tribe when it engages in economic activity in the state of Oklahoma. We view the legal status of the Tribe in its contractual relationship with Hoover to be that of a private party and subject to the jurisdiction of this state.[83] Accordingly, we are satisfied no injustice has been done by our decision in *Hoover I.*

**JUDGMENT OF THE DISTRICT COURT AFFIRMED.**

HODGES, HARGRAVE, OPALA and ALMA WILSON, JJ., concur.

LAVENDER and SIMMS, JJ., concur by reason of stare decisis.

WATT, J., concurs in result.

KAUGER, C.J., and SUMMERS, V.C.J., dissent.

¶ 1 KAUGER, Chief Justice, dissenting, with whom SUMMERS, Vice Chief Justice, joins:

¶ 2 The majority holds that a federally recognized Indian tribe conducting economic activity in Oklahoma may be sued in state court "on the same terms as any other person."[1] It equates the legal status of an Indian nation with that of a "private party."[2] In making the classification, the majority relies upon what it characterizes as the history of the diminishment of Indian sovereignty in Oklahoma. However, the question of the viability of tribal sovereignty is not presented. Rather, this cause revolves around the issue of waiver—whether the language of the promissory note and security agreement providing that nothing "subjects or limits the sovereign rights of the Kiowa Tribe of Oklahoma" was sufficient to subject the Tribe to suit in state court. I dissent, because: 1) the Tribe did not clearly waive its sovereign immunity; 2) Oklahoma has not met the congressionally imposed conditions necessary to assume civil and criminal jurisdiction over Indian tribes and nations; and 3) the evidence does not support a finding that Indian sovereignty in Oklahoma has been "diminished."

## I.

¶ 3 **WAIVER OF TRIBAL IMMUNITY.**

¶ 4 In *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106, the Supreme Court stated a well-settled principle—"that a waiver of sovereign immunity 'cannot be implied, but must be unequivocally expressed.'"[3] Indian tribes exercise inherent sovereign authority over their members and territories. Suits against Indian tribes are barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation.[4] Engaging in extra-territorial commercial activity does not strip an Indian tribe of its rights to assert sovereign immunity and to enjoin state court proceedings.[5] Although the majority attempts to undermine the efficacy of Oklahoma's failure to comply with the steps necessary to make it a P.L. 280 state, there is no contention that there has been a "congressional abrogation" of immunity. Therefore,

---

**83.** Accord, *Parden v. Terminal Railway of Alabama Docks Dept.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), wherein the Court said that implicit in a state's entering into federal-regulated economic activity is its consent to be bound by the regulation and subject to suit in federal court.

**1.** *Hoover v. Kiowa Tribe of Oklahoma (Hoover II),* 1998 OK 23, ¶ 2, —— P.2d ——.

**2.** *Id.* at ¶ 38.

**3.** *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501–02, 23 L.Ed.2d 52 (1969).

**4.** *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* note 27 infra; *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978); *Sac & Fox Nation v. Hanson,* 47 F.3d 1061, 1063 (10th Cir.1995), *cert. denied,* 516 U.S. 810, 116 S.Ct. 57, 133 L.Ed.2d 21.

**5.** *Sac & Fox Nation v. Hanson,* see note 4, supra; *In re Greene,* 980 F.2d 590 (9th Cir.1992); *Federico v. Capital Gaming Int'l Inc.,* 888 F.Supp. 354 (D.R.I.1995); *Elliott v. Capital Int'l Bank & Trust, Ltd.,* 870 F.Supp. 733 (E.D.Texas 1994), *aff'd,* 102 F.3d 549; *North Sea Products Ltd. v. Clipper Seafoods, Co.,* 92 Wash.2d 236, 595 P.2d 938 (1979).

if the Kiowa Indian Tribe is to be summoned into state court to answer for damages, it must have made a "clear waiver" of its sovereign status. Despite the language of the security agreement, indicating that the lender is entitled to exercise any and all rights and remedies provided in the Uniform Commercial Code, the Tribe did not definitively waive its sovereign immunity to suit in state court. Instead, the language of the promissory note and security agreement, providing that nothing will subject or limit the Tribe's sovereign immunity, is an express reservation of its sovereign status.

## II.

### ¶ 5 OKLAHOMA—P.L. 280 AND "INDIAN COUNTRY"

¶ 6 Based upon a statement by a prior Governor carrying no precedential value and its assertion that the term "Indian country" as defined in the congressional crimes act [6] is inapplicable in Oklahoma, the majority finds that Oklahoma's status as a disclaimer state under P.L. 280 is irrelevant in determining whether there is immunity for the Tribe's economic activity. I disagree.

¶ 7 Consistent with Congress' plenary role with respect to Indians and their lands, the Enabling Act of the State of Oklahoma,[7] in its recitation of the conditions of statehood, prohibits limiting or impairing rights of persons or property associated with Indians. The Oklahoma Const. art. 1, § 3 disclaims forever all right and title to all lands owned or held by any Indian, tribe or nation.[8] In 1953, Congress provided an avenue for states to assume civil and criminal jurisdiction under P.L. 280.[9] Pursuant to P.L. 280, some states were required to assume mandatory

6. The Major Crimes Act of 1948 is codified at 18 U.S.C. § 1151.

7. The Enabling Act of the State of Oklahoma provides in pertinent part:

"... That the inhabitants of all that part of the area of the United States now constituting the Territory of Oklahoma and the Indian Territory, as at present described, may adopt a constitution and become the State of Oklahoma, as hereinafter provided: Provided, that nothing containing the said constitution shall be construed to limit or impair the rights of persons of property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulations respecting such Indians, their lands, property or other rights by treaties, agreement, law or otherwise, which it could have been competent to make if this Act had never passed...."

8. The Okla. Const. art. 1, § 3 provides:

"The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States. Land belonging to citizens of the United States residing without the limits of the State shall never be taxed at a higher rate than the land belonging to residents thereof. No taxes shall be imposed by the State on lands or property belonging to or which may hereafter be pur-

chased by the United States or reserved for its use."

9. Section 2 of P.L. 280, 18 U.S.C. § 1162 (1953) provides:

"Sec. 2. Title 18, United States Code, is hereby amended by inserting in chapter 53 thereof immediately after section 1161 a new section, to be designated as section 1162, as follows: § 1162. State jurisdiction over offenses committed by or against Indians in the Indian country
(a) Each of the States listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over offenses committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State:

| State of | Indian country affected |
|---|---|
| California | All Indian country within the State |
| Minnesota | All Indian country within the State except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State, except the Menominee Reservation |

(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the

jurisdiction over Indian tribes.[10] In passing P.L. 280, Congress could easily have expressed its intent to grant the listed states complete jurisdiction over its resident tribes. Its failure to do so was a purposeful decision to reserve to the federal government jurisdiction over the tribes themselves.[11] In states not specifically listed and whose enabling acts contained Indian restrictions similar to Oklahoma's, affirmative action was required to assume jurisdiction through either constitutional amendment or statutory enactment.[12]

¶ 8 The states which exercise jurisdiction under P.L. 280 fall into two categories: 1) those who were required to assume jurisdiction under the statute—Alaska, California, Minnesota, Nebraska, Oregon, and Wisconsin;[13] and 2) those who have taken the prescribed steps necessary to assume jurisdiction either by constitutional amendment or statutory amendment[14]—Washington,[15] Montana,[16] and Idaho.[17] Oklahoma is conspicuously absent from the list of states exercising P.L. 280 jurisdiction.

¶ 9 Despite the language of Oklahoma's enabling legislation, specifically protecting the rights of Native Americans in Indian Territory,[18] section 6 of P.L. 280, 67 Stat. 590 (1953) provides:

"Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: Provided, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be."

Oklahoma has not amended its Constitution, nor has it complied with the conditions set forth in P.L. 280 to invoke jurisdiction over Indian tribes. It also has not assumed economic responsibility for tribal services currently provided by Indian nations, i.e., health care, indigent relief, road improvements, etc. The majority's reliance on a statement by Governor Johnston Murray, who served from 1951 to 1955, for the proposition that adoption of P.L. 280 in Oklahoma would make no difference to Native Americans in Oklahoma

United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.
(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section."

10. *Id.*

11. *Long v. Chemehuevi Indian Reservation,* 171 Cal.Rptr. 733, 115 Cal.App.3d 853 (Cal.App. 4.1981), *cert. denied,* 454 U.S. 831, 102 S.Ct. 129, 70 L.Ed.2d 109.

12. Section 6 of P.L. 280, 67 Stat. 590 (1953), provides:
"Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where neces-

sary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: Provided, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be."

13. Title 28 U.S.C. § 1360 (1984).

14. Section 6 of Act, Aug. 15, 1953, see note 12, supra.

15. *Washington v. Confederated Bands & Tribes of Yakima Indian Nation,* 439 U.S. 463, 473–74, 99 S.Ct. 740, 748, 58 L.Ed.2d 740 (1979) [Statutory enactment.].

16. *State v. Haskins,* 269 Mont. 202, 887 P.2d 1189, 1194 (1994) [Statutory enactment.].

17. *State v. Marek,* 112 Idaho 860, 736 P.2d 1314, 1320 (1987) [Statutory enactment.].

18. See note 7, supra.

is unconvincing. Had the state passed legislation or amended its constitution in conjunction with the federal statute—which it has not, civil and criminal jurisdiction could have been extended over Indian country. However, the window has closed on Oklahoma's opportunity to assume jurisdiction under P.L. 280 as originally enacted. The portion of the federal statute allowing for the assumption of jurisdiction was repealed in 1968.[19]

¶ 10  In *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), the Supreme Court held that the doctrine of sovereign immunity barred Oklahoma from collecting taxes on the sale of goods to Native Americans on tribal land. The Court also held that although Oklahoma could tax goods sold to non-Indians, it could not enforce its right by bringing a lawsuit against the tribe—the tribe's sovereign immunity barred a suit in district court. Although the Supreme Court stated that its decision relating to the state's right to tax was not based on prior cases arising in P.L. 280 states, it did recognize

that an election under P.L. 280 would have allowed the state to assume jurisdiction over civil causes of action in Indian country.[20] Therefore, Oklahoma's failure to act pursuant to the statute does affect—contrary to the majority's assertion—the extent of its jurisdiction in relation to Indian tribes and nations.

¶ 11  Title 57 O.S.1991 § 509.5 provides that Oklahoma assumes both the civil and criminal jurisdiction with respect to all criminal offenses and civil causes of action over Indian Country land if the state has entered into an agreement with the applicable tribal authority for the use of its land as an inmate work center.[21] This Court will not assume that the Legislature acts in vain in promulgating a statute.[22] Nevertheless, if Oklahoma had extended its jurisdiction as a P.L. 280 state, the enactment of a statute similar to § 509.5 would be a "vain act"—unnecessary because the state would already have jurisdiction over the lands involved.

¶ 12  The majority states that the history of this state in relation to its Native American inhabitants has been "obscured" at least

19.  Act Aug. 15, 1953, c. 505, § 7, 67 Stat. 590, which gave consent of the United States to any other State not having jurisdiction with respect to criminal offenses or civil cause of action, or with respect to both, as provided for in this section and section 1162 of Title 18, Crimes and Criminal Procedure, to assume jurisdiction at such time and in such manner as the people of the State shall, by legislative action, obligate and bind the State to assumption thereof, was repealed by section 403(b) of Pub.L. 90–284, Title IV, Apr. 11, 1968, 82 Stat. 79, such repeal not to affect any cession of jurisdiction made pursuant to such section prior to its repeal.

20.  *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* see note 27 infra, providing at p. 513, 111 S.Ct. at p. 911: "Neither Moe nor Colville depended upon the State's assertion of jurisdiction under Public Law 280. Those cases stand for the proposition that the doctrine of tribal sovereign immunity does not prevent a State from requiring Indian retailers doing business on tribal reservations to collect a state-imposed cigarette tax on their sales to nonmembers of the Tribe. Colville's only reference to Public Law 280 related to a concession that the statute did not furnish a basis for taxing sales to tribe members.... Public Law 280 merely permits a State to assume jurisdiction over 'civil causes of action' in Indian country. We have never

held that Public Law 280 is independently sufficient to confer authority on a State to extend the full range of its regulatory authority, including taxation, over Indians and Indian reservations.... Thus, it is simply incorrect to conclude that Public Law 280 was the essential (yet unspoken) basis for this Court's decision in Colville." [Citations of authority omitted.]

21.  Title 57 O.S.1991 § 509.5 provides in pertinent part:

"Inmate work centers in Indian County land—Civil and criminal jurisdiction—Expiration, cancellation or termination of agreement

A.  Pursuant to applicable federal law, the State of Oklahoma assumes both the civil and criminal jurisdiction with respect to all criminal offenses and civil cause of actions over Indian Country land wherein the state has entered into an agreement with the applicable tribes or other appropriate authority for use of said land as an inmate work center as established in Section 563 of Title 57 of the Oklahoma Statutes...."

22.  *Oklahoma Ass'n for Equitable Taxation v. City of Oklahoma City,* 1995 OK 62, 901 P.2d 800, 804; *TRW/Reda Pump v. Brewington,* 1992 OK 31, 829 P.2d 15, 20; *Farris v. Cannon,* 1982 OK 88, 649 P.2d 529, 532; *Moral Ins. Co. v. Cooksey,* 1955 OK 179, 285 P.2d 223, 227.

in part by the definition of Indian Country found in 18 U.S.C. § 1151 (1985). Title 18 U.S.C. § 1151 (1985) defines Indian County as:

> "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state; and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

This is the precise language used by Oklahoma's Legislature to define Indian Country in 68 O.S.Supp.1996 § 500.3(35) .[23] Additionally, the statute also provides that:

> "The term shall also include the definition of Indian country as found in 18 U.S.C., Section 1151."

The same language is used to define "Indian Country" in 68 O.S.Supp.1993 §§ 348 and 425 except that the reference to the federal statute is omitted. In *Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 453, 115 S.Ct. 2214, 2217, 132 L.Ed.2d 400 (1995) and in *Oklahoma Tax Comm'n v. Sac & Fox Nation,* 508 U.S. 114, 123, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30 (1993), the Supreme Court defined "Indian Country" as including "formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States." Contrary to the majority's assertion that Oklahoma history has been blurred by the use of the definition of Indian

Country found in 18 U.S.C. § 1151 (1985), it would appear that the Oklahoma Legislature has specifically embraced the definition in 68 O.S.Supp.1996 § 500.3(35) and in 68 O.S.Supp.1993 §§ 348 and 425. The Supreme Court has also found the definition specifically applicable to tribal lands in our state.

¶ 13 Most recently, the Supreme Court addressed the definition of "Indian County" in *Alaska v. Native Village of Venetie Tribal Government,* —— U.S. ——, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998). *Venetie* involved the tribe's attempt to tax improvements on land conveyed to privately owned corporations made up of Native American shareholders. The land had been conveyed to the private corporations as a part of a settlement executed pursuant to the 1971 Alaska Native Claims Settlement Act (ANSCA). The corporations took title to the land in fee simple without federal restriction or supervision. The Supreme Court considered only whether these conveyances fell under the "dependent Indian communities" portion of the definition of "Indian Country." The Court held, as it had in earlier cases,[24] that for property to be a portion of a dependent Indian community, it must: 1) be set aside by the federal government for the use of the Indians as Indian land; and 2) be under federal superintendence. In *Venetie,* neither condition existed. Therefore, the land was not subject to taxation by the tribe. The Supreme Court specifically provided that any modification of the current definition of Indian Country found in 18 U.S.C. § 1151 would have to be made by Congress.[25]

### III.

### ¶ 14 INDIAN SOVEREIGNTY IN OKLAHOMA

¶ 15 The majority does not explain how Indian sovereignty in Oklahoma has been

---

**23.** Title 68 O.S.Supp.1996 § 500.3(35), see note 31, infra.

**24.** *United States v. Sandoval,* 231 U.S. 28, 46, 34 S.Ct. 1, 5–6, 58 L.Ed. 107 (1913); *United States v. Pelican,* 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914); *United States v.. McGowan,* 302 U.S. 535, 538–39, 58 S.Ct. 286, 287–88, 82 L.Ed. 410 (1938).

**25.** The Supreme Court's opinion in *Alaska v. Native Village of Venetie Tribal Government,* —— U.S. ——, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998) provides in its last paragraph:

> "... [W]e are not free to ignore that requirement as codified in 18 U.S.C. § 1151.
> Whether the concept of Indian country should be modified is a question entirely for Congress."

adversely affected by: 1) the recognition in the United States Const. art. 1, § 8, cl. 3 [26] of Indian tribes' commercial equality to that of a foreign nation or a state; 2) recent cases promulgated by the United States Supreme Court in which the sovereignty of Oklahoma Indian tribes has been recognized; [27] 3) federal law [28] and Oklahoma statutes identifying Indian tribes as sovereigns; [29] 4) federal and state statutes acknowledging the existence of "Indian Country"; [30] 4) Oklahoma statutory law defining "Indian County" to include the definition found in 18 U.S.C. § 1151 and co-extensive with the language used in cases promulgated by the United States Supreme Court; [31] 5) the Legislature's recognition

**26.** The United States Const. art. 1, § 8, cl. 3 provides:

"Regulation of Commerce
To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

**27.** *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 464–65, 115 S.Ct. 2214, 2223, 132 L.Ed.2d 400 (1995) [Treaty provisions provided for tribal sovereignty within Indian country.]; *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30 (1993), *rehearing denied*, 509 U.S. 933, 113 S.Ct. 3066, 125 L.Ed.2d 748 (1993) [Federal District Court ordered on remand to consider factors relating to cause "against the backdrop of Indian sovereignty."]; *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) [Suits against Indian tribes barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation.].

**28.** Title 25 U.S.C. § 3601 (1993) provides in pertinent part:

"The Congress finds and declares that—
(1) there is a government-to-government relationship between the United States and each Indian tribe;
(2) the United States has a trust responsibility to each tribal government that includes the protection of the sovereignty of each tribal government;
(3) Congress, through statutes, treaties, and the exercise of administrative authorities, has recognized the self-determination, self-reliance, and inherent sovereignty of Indian tribes;
... (5) tribal justice systems are an essential part of tribal governments and serve as important forums for ensuring public health and safety and the political integrity of tribal governments ..."

**29.** Title 68 O.S.Supp.1996 § 500.63 provides in pertinent part:

"... (A)(1) Some Indian tribes within the State of Oklahoma are engaged in the retail sales of motor fuels at locations within their sovereign territories; ...
(4) It is mutually beneficial to the State of Oklahoma and the federally recognized Indian tribes of this state, exercising their sovereign powers, to enter contracts as set forth in subsection B of this section, for the purpose of limiting litigation on the issue of state government taxation of motor fuel sales made by Indian tribes. . . .
(C)(10) Both the State of Oklahoma and the accepting Indian tribe recognize, respect and accept the fact that under applicable laws each is a sovereign with dominion over their respective territories and governments. By entering into this proposed intergovernmental contractual relationship, neither the state nor the tribe has, in any way, caused the other's sovereignty to be diminished. . . ."
Title 68 O.S.Supp.1992 § 346 provides in pertinent part:
"... (A)(2) The doctrine of tribal sovereign immunity prohibits the State of Oklahoma from bringing a lawsuit against an Indian tribe or nation to compel the tribe or nation to collect state taxes on sales made in Indian country to either members or nonmembers of the tribe or nation without a waiver of immunity by the tribe or nation or congressional abrogation of the doctrine; and
... C. The Governor is authorized by this enactment to enter into cigarette and tobacco products tax compacts on behalf of the State of Oklahoma with the federally recognized Indian tribes or nations of this state. The compacts shall set forth the terms of agreement between the sovereign parties regulating sale of cigarettes and tobacco products by the tribes or nations or their licensees in Indian country. . . ."

**30.** Title 68 O.S.Supp.1996 §§ 500.3 and 500.63 [Referring to "Indian County" in the context of motor fuel tax compacts.]; 68 O.S.Supp.1993 §§ 346, 348 and 425 [Referring to "Indian County" in relation to cigarette and tobacco compacts.]; 57 O.S.1991 § 509.5 [Providing for the location of inmate work centers in "Indian Country."].

**31.** Title 68 O.S.Supp.1996 § 500.3(35) provides:
" 'Indian country' means:
a. land held in trust by the United States of America for the benefit of a federally recognized Indian tribe or nation;
b. all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation;
c. all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired terri-

that tribal sovereignty prohibits suits against Indian tribes for taxes on tobacco or motor fuel taxes and its authorization for compacts between the state and the tribes as "sovereign parties" for the collection of taxes;[32] 6) this Court's grant of full faith and credit to tribal courts[33] and the Legislature's affirmation of our authority to do so;[34] 7) the inclusion by the Legislature of Indian tribes in the Revised Uniform Certification of Questions of Law Act, 20 O.S.Supp.1997 § 1601, *et seq.*,[35] giving this Court and the Court of Criminal Appeals the power to certify questions of law to federally recognized Indian tribal governments[36] and the power to answer questions certified to the respective court by tribal courts[37] on the same grounds

tory thereof, and whether within or without the limits of a state; and

d. all Indian allotments, the Indian titles to which have not been extinguished, including individual allotments held in trust by the United States or allotments owned in fee by individual Indians subject to federal law restrictions regarding disposition of said allotments and including rights-of-way running through the same.

The term shall also include the definition of Indian country as found in 18 U.S.C., Section 1151."

The same language is used to define "Indian Country" in 68 O.S.Supp.1993 §§ 348 and 425 except that the reference to the federal statute is omitted. Title 18 U.S.C. § 1151 (1985) provides:

"Indian country defined

Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state; and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

*Oklahoma Tax Comm'n v. Chickasaw Nation*, see note 27, 515 U.S. at 453, 115 S.Ct. at 2217, supra; *Oklahoma Tax Comm'n v. Sac & Fox Nation*, see note 27, 508 U.S. at 123, 113 S.Ct. at 1991, supra, defining "Indian Country" as including "formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States."

**32.** Title 68 O.S.Supp.1996 § 500.63, see note 30, supra; 68 O.S.Supp.1992 § 346, see note 30, supra.

**33.** Rule 30, Rules for District Courts of Oklahoma, 12 O.S.Supp.1994 Ch. 2, App., provides in pertinent part:

"... B. Recognition of Tribal Judgments—Full faith and Credit

The district courts of the State of Oklahoma shall grant full faith and credit and cause to be enforced any tribal judgment where the tribal court that issued the judgment grants reciproc-

ity to judgments of the courts of the State of Oklahoma, provided, a tribal court judgment shall receive no greater effect or full faith and credit under this rule than would a similar or comparable judgment of a sister state...."

**34.** Title 12 O.S.Supp.1992 § 728 provides:

"A. This act affirms the power of the Supreme Court of the State of Oklahoma to issue standards for extending full faith and credit to the records and judicial proceedings of any court of any federally recognized Indian nation, tribe, band or political subdivision thereof, including courts of Indian offenses.

B. In issuing any such standard the Supreme Court of the State of Oklahoma may extend such recognition in whole or in part to such type or types of judgments of the tribal courts as it deems appropriate where tribal courts agree to grant reciprocity of judgments of the courts of the State of Oklahoma in such tribal courts."

**35.** Title 20 O.S.Supp.1997 § 1601.1 provides in pertinent part:

"... (2) 'Tribe' means a tribe, band, or village of native Americans which is recognized by federal law or formally acknowledged by a state."

**36.** Title 20 O.S.Supp.1997 § 1601.2 provides:

"Power to Certify. The Supreme Court or the Court of Criminal Appeals of this state, on the motion of a party to pending litigation or on its own motion, may certify a question of law to the highest court of another state, or of a federally recognized Indian tribal government, or of Canada, a Canadian province or territory, Mexico, or a Mexican state if:

1. The pending litigation involves a question to be decided under the law of the other jurisdiction;

2. The answer to the question may be determinative of an issue in the pending litigation; and

3. The question is one for which an answer is not provided by a controlling appellate decision, constitutional provision, or statute of the other jurisdiction."

**37.** Title 20 O.S.Supp.1997 § 1602 provides:

"Power to Answer. The Supreme Court and the Court of Criminal Appeals may answer a question of law certified to it by a court of the

that questions of law may be certified or answered if another state, Canada or Mexico is involved; 8) the federal government's grant of full faith and credit to protection orders [38] and to child support orders [39] issued by tribal courts; 9) the United States' grant of concurrent jurisdiction to Indian tribes to enforce its regulations relating to civil penalties for trespass on Indian agricultural lands [40] and for trespass on Indian forest lands [41]—upon request, the federal government is required to defer to tribal prosecutions of trespass actions on agricultural and forest lands and 25 U.S.C. § 3713 specifically provides that nothing is intended "to diminish the sovereign authority of Indian tribes with respect to trespass;" 10) the recognition of the sovereign status of Indian tribes and nations through legislative resolution; [42] and 11) the acknowledgment of a government-to-government relationship by executive declaration.[43] Clearly, the failure of legislation

United States, or by an appellate court of another state, or of a federally recognized Indian tribal government, or of Canada, a Canadian province or territory, Mexico, or a Mexican state, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling decision of the Supreme Court or Court of Criminal Appeals, constitutional provision, or statute of this state."

38. Title 18 U.S.C. § 2265 (1994) provides in pertinent part:
"Full faith and credit given to protection orders
(A) Full faith and credit.—Any protection order issued that is consistent with subsection (b) of this section by the court of one State or Indian tribe (the issuing State or Indian tribe) shall be accorded full faith and credit by the court of another State or Indian tribe (the enforcing State or Indian tribe) and enforced as if it were the order of the enforcing State or tribe...."

39. Title 28 U.S.C. § 1738B (1997) provides in pertinent part:
"Full faith and credit for child support orders
(a) General rule.—The appropriate authorities of each State—
(1) shall enforce according to its terms a child support order made consistently with this section by a court of another State; and
(2) shall not seek or make a modification of such an order except in accordance with subsections (e), (f), and (i).
(b) Definitions.—In this section:
... 'State' means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the territories and possessions of the United States, and Indian country (as defined in section 1151 of title 19)...."

40. Title 25 U.S.C. § 3106 (1990) provides in pertinent part:
"Forest trespass ...
(c) Concurrent jurisdiction
Indian tribes which adopt the regulations promulgated by the secretary pursuant to subsection (a) of this section shall have concurrent civil jurisdiction to enforce the provisions of this section and the regulation promulgated thereunder. The Bureau of Indian Affairs and other agencies of the Federal Government shall, at the request of the tribe, defer to tribal prosecutions of forest trespass cases. Tribal court judgments regarding forest trespass shall be entitled to full faith and credit in Federal and State courts to the same extent as a Federal court judgment obtained under this section."

41. Title 25 U.S.C. § 3713 (1993) provides in pertinent part:
"Indian agricultural lands trespass ...
(c) Concurrent jurisdiction
Indian tribes which adopt the regulations promulgated by the Secretary pursuant to subsection (a) of this section shall have concurrent jurisdiction with the United States to enforce the provisions of this section and the regulations promulgated thereunder. The Bureau and other agencies of the Federal Government shall, at the request of the tribal government, defer to tribal prosecutions of Indian agricultural land trespass cases. Tribal court judgments regarding agricultural trespass shall be entitled to full faith and credit in Federal and State courts to the same extent as a Federal court judgment obtained under this section. Nothing in this chapter shall be construed to diminish the sovereign authority of Indian tribes with respect to trespass."

42. S.C.Res. No. 62, adopted by the Senate on May 3, 1994, and by the House of Representatives on May 23, 1994, provides in pertinent part:
"... WHEREAS, the State of Oklahoma recognizes that the sovereign status of Indian tribes and nations and the special relationship that exists between the tribes and nations and the federal government are valuable assets that provide opportunities that would enhance the quality of life for all citizens of this state ..."

43. Executive Declaration dated April 26, 1989, and signed by Governor Henry Bellman provides in pertinent part:
"WHEREAS, the state of Oklahoma has the distinct honor of having more resident Indian Tribal Governments and Native Americans than any other state; and
WHEREAS, the Oklahoma Legislature and Governor have taken a leadership role in pro-

introduced in Congress to adopt this Court's interpretation of the law in *Hoover v. Kiowa Tribe of Oklahoma (Hoover I)*, 909 P.2d 59 (Okla.1995), *cert. denied*, 517 U.S. 1188, 116 S.Ct. 1675, 134 L.Ed.2d 779 (1996),[44] and the Oklahoma Legislature's passage of S.B. No. 482,[45] which would have overruled *Hoover I* had it not been vetoed by the Governor[46], is strong evidence that the law-making bodies on the national and on the state level realize that Indian tribal sovereignty exists and that it is a viable part of our nation's law. The

> moting government-to-government relations with the Indian tribes and nations by establishing the Joint Committee on State/Tribal relations ..."

**44.** H.R. 2107 from the 1st session of the 105th Congress provides in pertinent part:

> "AN ACT
> Making appropriations for the Department of the Interior and related agencies for the fiscal year ending September 30, 1998, and for other purposes ...
> *TRIBAL PRIORITY ALLOCATION LIMITATION*
> *SEC. 120. The receipt by an Indian Tribe of tribal priority allocations funding from the Bureau of Indian Affairs 'Operation of Indian Programs' account under this Act shall—*
> *(1) waive any claim of immunity by that Indian tribe;*
> *(2) subject that Indian tribe to the jurisdiction of the courts of the United States, and grant the consent of the United States to the maintenance of suit and jurisdiction of such courts irrespective of the issue of tribal immunity; and*
> *(3) grant United States district courts original jurisdiction of all civil actions brought by or against any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws or treaties of the United States ...."*

Debate on the Senate floor in relation to the above quoted section was held on September 16, 1997. The relevant debate was as follows:

> "Mr. CAMPBELL. Mr. President, I will move to section 120.
> EXCEPTED COMMITTEE AMENDMENT BEGINNING ON PAGE 55, LINE 11
> The PRESIDING OFFICER. The question before the Senate is the excepted committee amendment beginning on page 55, line 11. The text of the excepted committee amendment is as follows:
> —[The text of the above § 120, this note supra, was read into the record.]—
> Mr. CAMPBELL. I ask unanimous consent that the committee amendment referred to as section 120, beginning on page 55, line 11, be withdrawn.
> The PRESIDING OFFICER. Is there objection?
> Without objection, it is so ordered.
> The excepted committee amendment beginning on page 55, line 11, was withdrawn.
> Mr. CAMPBELL. Mr. President, I wasn't going to speak to that, but I might make one comment. As I read the language of the bill, there were so many unanswered questions.

> One that came to mind was this. As I understand section 120, tribes who did not want to give up their sovereign immunity would be denied Federal funds. If they did willingly give up Federal funds, then they would not have had to give up their sovereign immunity, which seemed strange to me because the tribes that are the most destitute and therefore the most dependent on Federal help, would have been the ones who would have had to give up immunity and therefore would have been sued more, where the very few, perhaps 1 out of 100, who do have a casino and have some money, simply would have said we don't want Federal money, we have enough; therefore, their immunity would have been intact. It seems that paradox should be the thing that we discuss in a proper forum, which is the committee legislation.
> With that, I have no further comments, Mr. President. I yield the floor...."

Legislation has been introduced in Congress this session which, if passed, would subject Indian tribes to suit in federal district court for failure to collect taxes on tobacco products. See, S. 1691, American Indian Equal Justice Act.

**45.** S.B. No. 482 passed by the Senate on May 23, 1997, and by the House on May 28, 1997, provides:

> "SECTION 1. NEW LAW. A new section of law to be codified in the Oklahoma Statutes as Section 90 of Title 20, unless there is created a duplication in numbering reads as follows:
> A. The district courts of this state shall have unlimited original jurisdiction of all justiciable matters, except as otherwise provided in the Constitution and laws of this state and the Constitution and laws of the United States.
> B. The State of Oklahoma recognizes the sovereign immunity of federally recognized Indian tribes. Such immunity shall not be a bar to the exercise of jurisdiction by the district courts of this state in the following cases:
> 1. Any case involving a contract or compact when the tribe has clearly and unequivocally waived its sovereign immunity by:
> a. A resolution adopted by the governing body of the tribe, or
> b. A written provision in the contract or compact at issue; or
> 2. Any case where the exercise of sovereign immunity has been abrogated by Congress or by a treaty with the United States."

**46.** The Governor's veto came after the close of the first session of the 46th legislative session on June 12, 1997.

United States Constitution, cases promulgated by the United States Supreme Court, state and federal statutory law, state-tribal relations demonstrated by the execution of state compacts, court rules and statutory enactments granting full faith and credit to tribal judgments and allowing certification of questions from tribal courts, the federal government's acknowledgment of concurrent jurisdiction in some instances, legislative resolution and executive proclamation, provide overwhelming support for the viability of tribal sovereign immunity.[47]

## CONCLUSION

¶ 16 The majority's opinion is focused on the assimilation of the Indian population. While the assimilationist policy prevailing at the beginning of the century must be considered in analyzing statutes which were enacted at that time, courts construing Indian legislation must keep in mind that present federal policy favors the strengthening of tribal self-government.[48] In order for the majority's reasoning to be upheld, it will be necessary for the United States Supreme Court to overrule its cases on requiring an express waiver of tribal sovereign immunity—*Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); and *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)—and its cases relating to "Indian country" and recognizing tribal sovereign immunity—*Alaska v. Native Village of Venetie Tribal Government*, —— U.S. ——,

118 S.Ct. 948, 140 L.Ed.2d 30 (1968); *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995); and *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993).

¶ 17 Although I agree that sovereign immunity is not an absolute shield against all suits for damages against tribal authorities in state court, jurisdiction may not be asserted absent a clear waiver of immunity.[49] No such waiver appears here. I dissent from the majority's intimation that Oklahoma's failure to assert its jurisdiction under P.L. 280 is inconsequential in causes involving jurisdiction over suits involving Indian tribes and nations and its insinuation that "Indian County" is something less than the definitions adopted by the Legislature and specifically applied to Oklahoma by the United States Supreme Court. Finally, the overwhelming evidence supports the existence of the doctrine of tribal sovereign immunity in Oklahoma.

¶ 18 Indian policy is made by Congress and it is interpreted by the United States Supreme Court. In *Alaska v. Native Village of Venetie Tribal Government*, —— U.S. ——, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998), the Supreme Court reiterated, in an unanimous opinion, that if "the concept of Indian country should be modified" is it for Congress to do so. Until Congress chooses to change the law or the Supreme Court interprets existing law in a different manner—which it has refused to do in regard to the definition of "Indian Country," the position taken by the majority is just not the law today. If it is tomorrow—if the Congress amends statutory enactments or the Supreme Court applies a

---

**47.** Recently, the United States Supreme Court denied certiorari in *Kerr–McGee Corp. v. Farley*, 115 F.3d 1498 (10th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 880, 139 L.Ed.2d 868 (1998), in which the Tenth Circuit Court held that tribal courts had the first opportunity to determine jurisdiction in civil actions involving non-Indian activities on tribal lands. The cause involves massive litigation relating to cancer caused by exposure to radioactive materials dumped on tribal lands by an energy company based in Oklahoma City.

**48.** *Estate of Johnson*, 178 Cal.Rptr. 823, 125 Cal. App.3d 1044 (Cal.App. 1.1981), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65.

**49.** *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, note 27, supra; *Santa Clara Pueblo v. Martinez*, see note 4, supra; *Sac & Fox Nation v. Hanson*, see note 4, supra.

different interpretation—then my dissent will be moot.

SUMMERS, Vice Chief Justice, dissenting, with whom KAUGER, Chief Justice, joins.

¶1 I dissent, first, for the reason that I believe the Court continues to misperceive the status of tribal sovereign immunity in Oklahoma. My views on this subject are found in dissenting opinions reported in the cases of *Aircraft Equipment Co. v. Kiowa Tribe of Oklahoma*, 1996 OK 81, 921 P.2d 359, 362–363, (Summers, J., dissenting, joined by Kauger, V.C.J.); *Aircraft Equipment Co. v. Kiowa Tribe of Oklahoma*, 1997 OK 59, 939 P.2d 1143, 1149–1150, (Summers, J., dissenting, joined by Kauger, C.J.). *See also First Nat. Bank in Altus v. Kiowa, Comanche and Apache Intertribal Land Use Committee*, 1996 OK 34, 913 P.2d 299, 301–302, (Kauger, V.C.J., dissenting, joined by Summers, J.).

¶2 But even should the majority of the Court turn out to be correct, the Court would be wise to use restraint, and defer its decision until the U.S. Supreme Court has spoken. The very issue, with the very same tribe, is presently before that court. Oral arguments were heard on January 12, 1998, in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, U.S.S.Ct. No. 96–1037. According to the brief filed in that case by the United States Solicitor General, the issue presented is whether the sovereign immunity from suit accorded Indian Tribes, as a matter of federal law, bars an action brought in state court to recover money damages for a breach of contract arising out of commercial activity undertaken by a Tribe outside Indian Country. U.S. Amicus Brief, 1997 WL 523859, August 25, 1997. That was the issue involving the same Tribe in *Hoover v. Kiowa Tribe of Oklahoma*, 1995 OK 136, 909 P.2d 59, *cert. denied*, 517 U.S. 1188, 116 S.Ct. 1675, 134 L.Ed.2d 779 (1996), (*Hoover I*), as well as in today's case.

¶3 The correctness or incorrectness of our former decision is about to be ruled upon by the United States Supreme Court. If we wait a few weeks to decide this case and the High Court confirms this Court's view of the law in *Hoover I*, the parties will have suffered no great injury by the delay in this already protracted litigation. On the other hand, if we don't wait upon the High Court's decision, and it later repudiates this Court's view of the law, an unnecessary burden will be placed on a party in this case.

¶4 It is certainly true that a party may seek certiorari from the U.S. Supreme Court based upon conflicting recent decisions of our Court and the U.S. Supreme Court, and that Court may grant certiorari and remand in light of its recent decision. *See e.g., National Private Truck Council, Inc. v. Oklahoma Tax Com'n*, 501 U.S. 1247, 111 S.Ct. 2882, 115 L.Ed.2d 1048 (1991); *Williams v. Phillips*, 442 U.S. 926, 99 S.Ct. 2853, 61 L.Ed.2d 294 (1979). But I see no need to put these litigants through yet another appeal in another court. This Court's contribution to the body of the law by its opinion today is not necessary for the litigants nor the law, because of the impending birth of the High Court's opinion on the same subject.

¶5 In *Aircraft Equipment Co. v. Kiowa Tribe of Oklahoma*, 1996 OK 81, 921 P.2d 359, 362–363, (Summers, J., dissenting, joined by Kauger, V.C.J.), I expressed the view, supported by authority, that the Tribe was immune from suit in state court unless that immunity had been removed by Congress or waived by the Tribe. I will not repeat that authority here. Congress has not changed the Tribe's immunity, although some members of the Senate talked about it in the last session. Our Court, however, has come to the conclusion that the Tribe has no immunity from suit in state court when the suit is based upon activity occurring outside Indian Country. The Court's historical analysis throws down a gauntlet challenging the long established concepts that (1) Public Law 280 is relevant to state-tribal relations in Oklahoma, and (2) tribes possess immunity from suit in Oklahoma state courts unless waived. Before making such a pronouncement I would await clarification from that Court which has the authority to review our decision in this matter and is in the process

of preparing its opinion to resolve the question.